IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| PERRY L. HERRING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:14-cv-04174-NKL |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Perry L. Herring appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income. The decision is affirmed.

**I.    Background**

Herring was born in 1961, graduated from high school, and last worked in construction. He also worked as a commercial service technician and casino manager. He alleges disability beginning October 1, 2010, the date he reportedly stopped working due to medical conditions.

**A.  Medical history**

Herring began having seizures in 2009 and was prescribed medication. In June 2010, after not having had a seizure for six months, he saw his neurologist, Manjamalai Sivaraman, M.D., asking to return to his construction work. The doctor permitted it, so long as Herring remained on the ground floor of the job site. Herring reported a number of seizures and a black out to neurologist Rezwan Islam, M.D., and to Dr. Sivaraman from October through December 2010. His medications were adjusted. In December 2010, Dr. Sivaraman instructed Herring not to drive or operate machines.

A January 2011 EEG revealed abnormal results, supporting a diagnosis of "partial

epilepsy." [Tr. 268.] In March 2011, Herring complained to Dr. Sivaraman of some short-term memory loss. An MRI showed evidence of a small arachnoid cyst.

Herring saw Dr. Sivaraman in January 2012, reporting two seizures since his March 2011 visit. The doctor instructed Herring not to drive or operate machinery. Herring saw Dr. Islam in August 2012, reporting having had a seizure a couple of days earlier. Herring saw neurologist David McLaren, M.D., in October 2012. Dr. McLaren noted Herring was having nocturnal seizures. Herring saw Dr. McLaren again in November 2012. Herring did not report any new seizures. Dr. McLaren's notes for the visit indicate there was no observable decrease in ability to concentrate and that Herring's memory was not impaired. Results of an EEG performed in November 2012 were normal.

### B. Treating physician's opinion, and other opinion evidence

Dr. Islam, one of Herring's neurologists, provided a mental capacity assessment in July 2011. Dr. Islam opined that Herring has marked limitations in ability to remember locations and work-like procedures; moderate limitations in ability to understand and remember very short and simple instructions and detailed instructions; moderate to extreme limitations in ability to sustain concentration and persistence; slight to moderate limitations in social interaction; and slight to marked limitations in ability to adapt. [Tr. 355-357.] Dr. Islam opined that Herring's seizures cause "extreme" memory loss and impaired concentration, and that Herring has periods of depression that may affect his ability to interact with co-workers. [Tr. 355-356.]

Dr. Islam also filled out a seizure questionnaire. The doctor stated Herring suffers from complex generalized seizures that occur about once a month, lasting five to seven minutes and requiring six to eight hours of recovery time. The doctor opined that Herring's seizures render him unable to perform even simple tasks alone. He opined Herring would have multiple limitations that would affect his ability to work including inability to focus, memory loss, and

2

seizures. [Tr. 673-76.]

In August 2012, Dr. Islam provided a written statement on Herring's behalf, opining that due to Herring's medical conditions, including seizure disorder and depression, it would be in his best interest to have a caregiver or companion to help him with his medications, personal care, and activities of daily living.

Thomas Spencer, Psy.D., performed a consultative examination in September 2011 and reviewed Herring's medical records. Herring reported having seizures every few months. The mental status exam yielded largely normal results other than questionable judgment and insight, although Dr. Spencer noted Herring was questionably cooperative. Dr. Spencer diagnosed adjustment disorder with depression and anxiety, and assigned a global assessment of functioning (GAF) score of 60-65, consistent with moderate to mild symptoms. Dr. Spencer opined that Herring has the ability to understand and remember simple to moderately complex instructions; to engage in and persist with simple to moderately complex tasks; and is moderately impaired in his ability to interact socially and adapt to change in the workplace. [Tr. 365-69.] The ALJ gave the opinion partial weight, finding Herring more limited in memory than indicated by Dr. Spencer. [Tr. 22.]

Michael Stacy, Ph.D., reviewed Herring's record in October 2011 at the request of the state agency. Dr. Stacy opined Herring has moderate limitations on daily activities and concentration; persistence or pace; has mild restrictions on daily living; and has had one or two episodes of decompensation. Dr. Stacy concluded Herring could understand, remember, and carry out simple to moderately complex instructions and make commensurate work related decisions; relate acceptably to others in a setting with limited social demands; and adapt to most changes common in normal competitive employment. [Tr. 371-85.] The ALJ gave the opinion partial weight, finding Herring was more limited in memory than Dr. Stacy found. [Tr. 22.]

Donald Limper, Herring's previous employer, provided a letter which the ALJ considered as lay opinion evidence. Limper explained Herring was originally laid off because Herring's doctor advised him to refrain from construction work, and that after six months without a seizure, Herring returned to work part-time. Limper stated that when Herring returned, his job performance was significantly diminished. He stated Herring was noticeably forgetful, had difficulty concentrating, and could not remember measurements or instructions. Limper said Herring was laid off for safety reasons when his seizures resumed. [Tr. 178-80.] The ALJ gave the statement limited weight, because it dealt only with Herring's inability to return to past work, not his ability to perform other work. [Tr. 22.]

The ALJ gave little weight to the third-party function report prepared by Herring's friend LaDonna Scheiber, because it was not consistent with medical opinions of record. [Tr. 22-23.]

### C. Herring's testimony

The hearing was held in December 2012. Herring testified he suffers from seizures that come without warning and last a few seconds to a couple of minutes. After a seizure, he said, he often cannot move on his own and has problems speaking, and it takes an hour or hour and a half to recognize where he is and who he is with. Herring testified that he had 15 to 16 seizures in 2012. He said that his doctors instructed him to let them know when he had a seizure. He has at times had seizures when he does not take his medications. He testified that the main side effect of his current seizure medication is "some drowsiness." [Tr. 63.]

Herring testified he suffers from memory issues and that his daughter moved in with him to ensure he was properly taking his medications. He watches television and plays a game on the computer most of the day, and takes care of his reptiles which he must feed and put in warm water in the bathtub every day. He prepares simple meals and does dishes, and shops but not by himself. His daughter puts his medications in a pill organizer for the week, and he has alarms set

on his phone throughout the day to remind him to take his medications. He sometimes needs to be reminded to shower and shave.

Herring admitted he drives five times a week, for a total of ten to 20 miles a week. He drove 30 miles by himself to attend the December 2012 hearing. His doctor has told him he should be seizure-free for a period of six months before driving.

At some point after October 2010, when Herring stopped working in construction, he "went around dropping [job] applications in various different places" within walking distance of where he lives. [Tr. 39.] Two weeks before the hearing, Herring submitted a job application for a full-time stocker position at a grocery store. The ALJ asked Herring, "Do you think that you would be able to do any job no matter how simple it is for a sustained basis, you know, eight hours a day, five days a week?' [Tr. 61.] Herring answered, "I'm not sure. I would like to be able to. I'm—again, I'm not sure if—I mean with my memory problems, what I'm told to do today I might not remember tomorrow. And I'd probably have to [have] somebody come back over and—that's another reason why…my daughter…[lives with me]." [*Id.*]

### D. The ALJ's decision

The ALJ found Herring has severe impairments of seizure disorder, adjustment disorder, mood disorder, and memory impairment. The ALJ concluded Herring did not meet Listing 11.02, convulsive epilepsy, because he does not have seizures occurring at least once a month in spite of three months of treatment; Listing 11.03, non-convulsive epilepsy, because he does not have seizures occurring more frequently than once weekly in spite of at least three months of treatment; or Listing 12.04, affective disorders, because he met neither the paragraph B nor C criteria.

The ALJ found Herring has the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

5

Case 2:14-cv-04174-NKL   Document 15   Filed 04/30/15   Page 5 of 11

> [Herring] may occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He may occasionally balance, but never crawl. He can never drive automotive equipment or work around unprotected heights or hazardous machinery. The claimant is limited to simple work consisting of one to two step instructions. He may have occasional superficial non-confrontational contact with coworkers and supervisors, but should not work with the general public. The claimant is able to tolerate few minor changes in a routine work setting, defined as up to twice per month and not involving core functions of his job.

[Tr. 17.] Herring's subjective complaints were out of proportion to the medical evidence, and Dr. Islam's opinion including extreme limitations was given little weight. The ALJ further found Herring is unable to perform any past relevant work, but can perform the requirements of light unskilled occupations such as small parts assembler and plastic product inspector, jobs existing in significant numbers of the national economy.

The ALJ concluded Herring is not disabled.

## II. Discussion

Herring argues that the ALJ should have given controlling weight to the opinion of his treating physician, Dr. Islam, and that the RFC, credibility determination, and decision at Step 5 are not based on substantial evidence. He asks for reversal and remand for further proceedings.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. Weight given Dr. Islam's medical opinion

All medical opinion evidence, regardless of source, is weighed by examining the length

of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs.  20 C.F.R. § 404.1527; 20 C.F.R. § 404.927.

If a treating physician's opinion concerning the nature and severity of a claimant's impairment "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given "controlling weight."  20 C.F.R. § 404.1527.  But an "ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation omitted).  *See also Blackburn v. Colvin,* 761 F.3d 853, 860 (8th Cir. 201) (same).

The ALJ gave Dr. Islam's opinion little weight, on the basis that it was inconsistent with Herring's own testimony, Dr. Islam's treatment records, and other parts of the record.  For example, Dr. Islam's description of the length of Herring's seizures and recovery time needed after a seizure is nowhere near Herring's description of seizures that last two minutes at most and from which he recovers in one to one and a half hours.  Dr. Islam's treatment notes contain no indication of extreme memory loss and impaired concentration, and are inconsistent with treatment records from late 2012 reflecting no such memory loss or impaired concentration. Dr. Islam's treatment records do not reflect that he performed a formal memory assessment or mental status exam.  But the record does include such assessment and exam by Dr. Spencer, who found no more than mild or moderate symptoms.  Dr. Islam's statement that Herring requires a caregiver or companion to assist him is inconsistent with Herring's description of his

7

performance of activities of daily living, use of an alarm to help him remember to take his medication, and driving five days a week.

In view of the foregoing, the Court will not disturb the ALJ's decision to give Dr. Islam's opinion little weight.

### B. Credibility determination

When an ALJ determines that a claimant is not credible and decides to reject the claimant's statement, the ALJ must provide specific reasons for the credibility finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); *Prince v. Bowen*, 894 F.2d 283, 296 (8th Cir. 1990). The ALJ must specifically consider evidence related to the claimant's work record; daily activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa*, 922 F.2d at 485 (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see also* 20 C.F.R. 404.1529 and 416.929 (codifying the *Polaski* factors). *Compare Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony.")

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination." *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (internal quotation and citation omitted).

Here, the ALJ considered the *Polaski* factors. As for activities of daily living, the ALJ noted that notwithstanding Herring's testimony that his seizures occur without warning, and his doctor's instruction that should be seizure-free for six months before driving, he drives five times per week and even drove himself to the disability hearing. Herring's lack of concern about

8

performing a dangerous activity like driving "erode[d] the credibility of his allegations that his seizures have rendered him disabled." [Tr. 19.] Herring also engages in other activities of daily living such as preparing simple meals, cleaning, shopping for groceries, playing games on the computer, and caring for pets. Such activities are inconsistent with subjective complaints of disabling conditions. *See Medhaug v. Astrue,* 578 F.3d 805, 817 (8th Cir. 2009) (activities such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain).

Further undermining Herring's credibility, he has not always taken his prescribed medications and some of his reported seizures occurred when he was not taking his medication. A January 2011 EEG showed activity consistent with partial epilepsy, but a November 2012 EEG yielded normal results. Herring told consulting examiner Dr. Spencer in October 2011 that he was having seizures every few months. Herring testified his doctor told him to call when he had a seizure, and that he had had 15 to 16 seizures in 2012, but there is no mention of 15 to 16 calls about seizures in Herring's 2012 medical records. The medical record in fact reflects few seizures since March 2011. One of Herring's doctors stated late in 2012 that Herring was having nocturnal seizures, while asleep, but there is no medical evidence that they affected his ability to work during the day. The same doctor noted Herring had no decrease in concentration and that his memory was unimpaired. Herring has never seen a mental health provider for depression.

Herring has also looked for employment since his alleged onset date, submitting multiple job applications. As recently as two weeks prior to his hearing, he applied for a full-time job as a grocery stocker at a store within walking distance from his home. The filing of such applications indicates Herring believes he is able to work.

The ALJ articulated the inconsistencies upon which he relied in discrediting Herring's testimony about his subjective complaints, and substantial evidence in the record as a whole

9

supports the ALJ's credibility finding. Accordingly, this Court will not disturb the finding.

## C. Support for the RFC

Herring also argues that the RFC is not based on substantial evidence. Residual functional capacity is what a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a). It is an assessment based upon all of the relevant evidence including a claimant's description of his limitations, observations by treating and examining physicians or other persons, and medical records. 20 C.F.R. § 404.1545(a). Put another way, the RFC must be upon all of the substantial evidence, and must be supported by at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).

Here, the decision reflects that the ALJ considered the entirety of the record. The RFC is based on substantial evidences including medical evidence. The ALJ appropriately tailored the RFC to include non-exertional limitations, accounting for Herring's seizures, adjustment and mood disorders, and memory problems. The limitations relating to ramps, stairs, ladders, ropes and scaffolds, driving automotive equipment, or working around unprotected heights or hazardous machinery are consistent with his neurologist's limitations concerning his seizure disorder. The limitations to simple work consisting of one- or two-step instructions, and having few minor changes in his work setting involving only non-core job functions, are consistent with the record concerning his memory problems. The limitations regarding occasional superficial, non-confrontational contact with coworkers and supervisors, and no work with the general public, are consistent with his adjustment and mood disorders. The RFC is also consistent with Herring's own testimony that he has applied for employment since the alleged onset date and that he would like to be able to work, but is concerned about his memory problems.

The ALJ's RFC determination is supported by substantial evidence, including medical evidence, and will not be disturbed.

10

Case 2:14-cv-04174-NKL   Document 15   Filed 04/30/15   Page 10 of 11

### D. Ability to perform other work

Herring's final argument is that because the ALJ's RFC and credibility determinations are not based on substantial evidence, the finding at Step 5—that Herring can perform other work existing in significant numbers in the national economy—is not supported by substantial evidence. This argument depends on Herring's prior ones, which the Court has already rejected. Accordingly, the Court rejects Herring's final argument.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: April 30, 2015
Jefferson City, Missouri